# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| YONAS GHIRMAY | CIVIL ACTION |
| VERSUS | NO: 07-1826 |
| BERHANE TSEGIA d/b/a<br>SEMBEL MULTIMEDIA PRODUCTION | SECTION: "C" (2) |

## ORDER & REASONS

On August 8, 2009, the Court ordered a default judgment against defendant Sembel Multimedia Production. (Rec. Doc. 31). It simultaneously ordered plaintiff to provide additional briefing to assist in the calculation of damages, which plaintiff provided on September 9, 2009. (Rec. Doc. 32). Having considered that briefing and the evidence in the record, the Court now awards damages, as set forth below.

**I. Law and Analysis**

Defendant used plaintiff's songs and master recordings in the movie *Men Efet* without plaintiff's authorization. (Rec. Doc. 31). Plaintiff alleges that six songs and six master recordings were used a total of ten times throughout the film.[1] (Rec. Doc. 32 at 4). He estimates that 15,000 DVDs were sold. (Rec. Doc. 32 at 5). Plaintiff suggests two alternative methods for calculating the appropriate damages: one based on a flat buy-out rate per song, and one based on per-DVD sales fees. (Rec. Doc. 31 at 4-5).

---

[1] Per Exhibit C to Plaintiff's original complaint, however, only five different tracks were used in the film. The record does support ten total uses.

1

Despite repeated opportunities to supplement the record with some evidence to corroborate his 30,000 DVD estimate, plaintiff has not provided any. As such, the Court declines to adopt this estimate, and will use the buy-out option calculation method to avoid reliance on unsubstantiated DVD sales.

Plaintiff argues that he would have licensed "the masters and songs for $1,500 for each portion, for a total of $3,000 per song and track resulting in *twenty five thousand* dollars or more."[2] (Rec. Doc. 32 at 5) (emphasis in original). As explained in the Court's previous Order and Reasons:

> The Court does not consider what the owner would have charged, however, to be a reasonable license fee. *See On Davis* [*v. The GAP, Inc.*, 246 F.3d 152, 166 (2d Cir. 2001)]. The question is always what the fair market value for the copyrighted work is. *Id.* Thus, "the owner must show that the thing taken had a fair market value." *Id.* As the U.S. [Second] Circuit Court of Appeals pointedly stated:
>
>> [T]he fair market value to be determined is not of the highest use for which plaintiff might license but the use the infringer made. Thus, assuming the defendant made infringing use of a Mickey Mouse image for a single performance of a school play before schoolchildren, teachers and parents with tickets at $3, the fair market value would not be the same as the fee customarily charged by the owner to license the use of this image in a commercial production.
>
> *Id.*, fn. 5.
>
> Furthermore, while courts have stated that the amount of damages should not be based on "undue speculation," *Abeshouse v. Ultragraphics, Inc.*, 752 F.2d 467 (2d Cir. 1985)), "finding the fair market value of a reasonable license fee may

---

[2] "Each portion" in this context appears to refer to the masters and songs, but plaintiff would also need to require a separate fee per use of each song to reach a total figure over twenty five thousand dollars.

involve some uncertainty." *On Davis*, 246 F.3d at 166. "[U]ncertainty will not preclude recovery of actual damages if the uncertainty is as to amount, but not as to the fact that actual damages are attributable to the infringement." 4 Nimmer § 14.02 [A], at 14-12 ; *see also* II Paul Goldstein, *Copyright* § 12.1.1, at 12:6 (2d ed. 2000) ("Once the copyright owner shows a connection between infringement and damage, uncertainty about the amount of damages will not bar an award.").
(Rec. Doc. 31 at 6-7).

In addition to his own assertions as to what he would have charged for licensing his work, plaintiff has provided excerpts from a treatise on music licensing, *Kohn on Music Licensing*,[3] as well as sample licensing agreements that plaintiff's counsel has previously negotiated. (Rec. Doc. 32-2, 32-3, 32-4, 32-5).

*Kohn* indicates that determining a song's value includes both quantitative and qualitative factors. Kohn, *supra*, at 578. Quantitative factors include "how much the song has earned in licensing revenues in the past and how much others might be presently willing to pay for the copyright." *Id.* Qualitative factors include the popularity of the song, the demographics of the listeners who are responsible for the song's popularity, the historical significance of the song, and overall quality of the song." *Id.* All of these are unknown to the Court.

The sample agreements submitted by plaintiff include one for "a master-use license, synchronization license together with a DVD buy-out option for two thousand three hundred dollars" for a 90 second song use, and another for a four thousand dollar payment for the use of two master tracks and an additional four thousand dollars for the option to use that song in DVD release. (Rec Doc 32 at 3). Both songs appeared in the film *Hurricane on the Bayou*, produced

---

[3] Al Kohn & Bob Kohn, *Kohn on Music Licensing* (3d ed. 2002).

3

by Audubon Nature Institute and MacGillivray Freeman Films, Inc. (Rec. Doc. 32 at 3). Judging from the second of these agreements, this film was intended for distribution in I-Max Theatres. (Rec. Doc. 32-5 at 1).

The Court is faced with the task of assigning a fair market value to the infringed work without the benefit of any information regarding the scope of "the use the infringer made," *On Davis*, 246 F.3d at 166 n.5, or any of the factors recommended by *Kohn* for determining song value. There is no evidence in the record as to the distribution or commercial popularity of *Man Efet*. The only clues available to the Court are plaintiff's concession that it is a "small movie" (Rec. Doc. 32-5), and the impression that neither the plaintiff nor the defendant command a significant American market.[4]

In the section of *Kohn* submitted by plaintiff, the authors list sample licensing and synchronization fees amounts for various categories of visual media, ranging from fifty dollars for a song used in a high school video yearbook to $200,000 for a song featured in a major motion picture. (Rec. Doc. 32-2 at 2-4). But none of the categories included (theatrical motion picture; corporate video; music video; film trailer; commercial) clearly apply here: *Man Efet* is a limited release motion picture and it is unknown to the Court whether it was ever shown on "big screens."

The infringement here included the use of five different songs, played multiple times each throughout the film, for anywhere from approximately fifteen seconds to approximately

---

[4] Presumably, if Plaintiff had other evidence to support either his or defendant's commercial success, that evidence would have been presented to the Court.

three minutes. The Court assumes–again, without the benefit of adequate evidence–that songs licensed for use in a film produced for I-Max Theatres can command a higher fee than a limited release DVD. Based on the above discussion, the Court finds that $1,500 is a reasonable recovery per song for master track, synchronization, and DVD buy-out fees.

Neither *Kohn* nor the sample licensing agreements address the use of the same song multiple times throughout the same film. The language in *Kohn* typically refers to fees on a "per song" not a "per use" basis. Kohn, *supra*, at 1604-05. However, it is reasonable to assume that additional uses ought to garner some additional fees. The Court therefore finds an additional $750.00 per additional use to be reasonable in this case.

Accordingly,

**IT IS ORDERED** that plaintiff is awarded $11,250.00.

New Orleans, Louisiana, this 11th day of January, 2010.

**HELEN G. BERRIGAN**
**UNITED STATES DISTRICT JUDGE**